T.C. Memo. 2014-52

UNITED STATES TAX COURT

GORDON KAUFMAN AND LORNA KAUFMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 15997-09.                    Filed March 31, 2014.

On remand from the U.S. Court of Appeals for the First Circuit,
<u>Kaufman v. Shulman</u>, 687 F.3d 21 (1st Cir. 2012), <u>aff'g in part,
vacating and remanding in part</u> <u>Kaufman v. Commissioner</u>, 136 T.C.
294 (2011), <u>and</u> 134 T.C. 182 (2010), to consider (1) R's disallowance
of Ps' charitable contribution deductions on account of their
contribution of a facade easement to the National Architectural Trust
and (2) accuracy-related penalties.

<u>Held</u>:  Disallowance of charitable contribution deductions
sustained on the ground that the value of the facade easement is zero.

---

[*]This opinion supplements our Opinions in <u>Kaufman v. Commissioner</u>, 136
T.C. 294 (2011), and 134 T.C. 182 (2010), <u>aff'd in part, vacated and remanded in
part sub nom.</u> <u>Kaufman v. Shulman</u>, 687 F.3d 21 (1st Cir. 2012).

**[*2]** <u>Held</u>, <u>further</u>, accuracy-related penalties sustained on the basis of gross valuation misstatement or, alternatively, on the basis of negligence or substantial understatement of income tax.

<u>Frank Agostino</u>, <u>Julie Pruitt Barry</u>, <u>Eleanor E. Farwell</u>, and <u>Michael E. Mooney</u>, for petitioners.

<u>Carina J. Campobasso</u> and <u>Janet F. Appel</u>, for respondent.

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, <u>Judge</u>:  This case is before the Court on remand from the U.S. Court of Appeals for the First Circuit.  <u>Kaufman v. Shulman</u>, 687 F.3d 21 (1st Cir. 2012), <u>aff'g in part, vacating and remanding in part</u> <u>Kaufman v. Commissioner</u>, 136 T.C. 294 (2011), <u>and</u> 134 T.C. 182 (2010).  The case involves deficiencies in petitioners' Federal income tax for 2003 and 2004 resulting from respondent's disallowance of petitioners' deductions for contributions of a facade easement and of cash to the National Architectural Trust (NAT).  The case also involves accuracy-related penalties relating to those deductions.  In <u>Kaufman</u>, we sustained respondent's disallowance of petitioners' deductions for 2003 and 2004 on account of the contribution of the facade easement and of petitioners' deduction for 2003

**[*3]** on account of their cash contribution claimed for that year. We sustained portions of the penalty determinations. The Court of Appeals vacated our decision entered in accordance with our conclusions in <u>Kaufman</u> except with regard to the deductibility of petitioners' 2003 cash contribution and the associated penalty. The Court of Appeals remanded the matter to this Court for proceedings consistent with its decision. The parties agree that the questions presented on remand are as follows:

1. the allocation of the burden of proof with respect to the value of the facade easement and the remaining penalties;

2. the effect of the contribution of the facade easement on the fair market value of petitioners' property burdened by the easement; i.e., the amount, if any, of the diminution in that fair market value resulting from the creation and grant of the easement;

3. (a) whether an accuracy-related penalty may be imposed on account of either a substantial or a gross valuation misstatement;

(b) if yes, whether the reasonable cause exception applies to avoid imposition of the penalty;

(c) if no accuracy-related penalty on account of a valuation misstatement is imposed, whether an accuracy-related penalty on account of either (1)

[*4] negligence or disregard of rules or regulations or (2) a substantial understatement of income tax may be imposed;

>  (d)  if yes, whether the reasonable cause exception applies to avoid imposition of the penalty.

The parties agree that the record is adequate to answer the questions presented on remand.  They have filed supplemental briefs.  Unless otherwise stated, section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

For convenience, we repeat or summarize here portions of our findings of fact in Kaufman and make additional findings necessary to answer the questions presented.

Background

Petitioners are husband and wife.  Gordon Kaufman[1] is the Morris A. Adelman Professor of Management Emeritus of the Sloan School of Management at the Massachusetts Institute of Technology.  He specializes in statistical analysis.

---

[1]Since both petitioners hold doctoral degrees, and both could thus be referred to as Dr. Kaufman, we will avoid confusion by, in general, referring to them individually as Gordon Kaufman and Lorna Kaufman, respectively.

[*5] Lorna Kaufman has a Ph.D. in developmental psychology from Boston College and is president of her own company.

The Property

In 1999, Lorna Kaufman purchased real property (property) in Boston, Massachusetts. The property consists of a lot and a single-family residence (a rowhouse), which is petitioners' home. The property is in a designated historic district and is subject to the South End Landmark District Residential Standards and Criteria (South End Standards and Criteria).

The Preservation Agreement

In December 2003, Lorna Kaufman entered into a preservation restriction agreement (preservation agreement) with NAT pursuant to which she granted to NAT an easement in gross, in perpetuity (i.e., the facade easement), burdening the property and pursuant to which, with respect to the property, she accorded to NAT certain rights and, on behalf of herself and her successors in interest, she undertook certain duties. Among those rights and duties are the following. Without consent of NAT, the owner of the property may not alter, construct, or remodel existing improvements on the property, nor may she place on the property signs or markers that would change the condition, materials, or appearance of the building's facade. Without NAT's consent, the owner may not extend existing

[*6] improvements on the property, nor may she erect any new or additional improvements. The owner may not without NAT's consent paint or clean the facade. The owner agrees to maintain in good order the roof, facade, foundations, and overall structural integrity of the building in the condition and appearance existing on the date of the preservation agreement. The owner also agrees that any repair, replacement, alteration, rehabilitation, or new construction work on the facade will be done in accordance with "the Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for Preserving, Rehabilitating, Restoring, and Reconstructing Historic Buildings". The owner agrees to carry insurance on the property with replacement cost coverage against loss from all perils commonly covered under the broadest standard homeowner's policy. The owner agrees that NAT may inspect the property. The owner also agrees to reimburse NAT's costs and legal fees should she violate the preservation agreement and it become necessary for NAT to bring suit to enforce it. The owner agrees to allow NAT to enter the property in order to correct violations, and she agrees to reimburse NAT's costs. The owner agrees that, if the preservation agreement is ever extinguished, NAT will be entitled to a portion of the proceeds from any subsequent sale.

**[\*7]** <u>The Hanlon Appraisal</u>

In January 2004, on Gordon Kaufman's inquiry of it, NAT recommended to him two appraisers. The Kaufmans selected one, Timothy J. Hanlon, whom they engaged to determine the diminution in the value of the property on account of the contribution of the facade easement to NAT (hereafter, sometimes, value of the facade easement). Mr. Hanlon has been certified by the Commonwealth of Massachusetts as a State-certified residential real estate appraiser; he is also a Housing and Urban Development FHA approved appraiser. He is a licensed real estate broker. He inspected the property on January 20, 2004. He prepared an appraisal of the property (Hanlon appraisal) as of that date, which, by letter dated January 30, 2004, he submitted to Lorna Kaufman. He reported the value of the property to be $1,840,000 before the grant of the facade easement. He concluded: "The property is considered to have a reduction in fair market value of 12% of the property's value prior to the easement donation, which equates to a loss of $220,800 (rounded)."

NAT had put Mr. Hanlon on a list of what it represented to be qualified appraisers that it provided to potential donors to NAT. The Hanlon appraisal is one of nine appraisal reports that, beginning in 2003 and continuing through approximately the end of 2004, Mr. Hanlon completed with respect to

[*8] contributions of facade easements to NAT.  Other than those nine reports, he has no experience in appraising partial interests in real property.  In preparing to complete his first appraisal of a facade easement, Mr. Hanlon spoke by telephone with someone at NAT, most likely Steven L. McClain, now president of NAT, or Mory Bahar, a representative of NAT.  His purpose for the call was to get a feel for how appraisals of facade easements were done and what had been accepted by the Internal Revenue Service (IRS).  His notes of that conversation indicate that either Mr. McClain or Mr. Bahar told him that the range of values for facade easements is between 11% for properties in highly regulated areas and ("towards") 15% in less regulated or unregulated areas.  With respect to the 11% figure for properties in highly regulated areas, Mr. Hanlon wrote in his notes:  "95% fall in this percentage".  His final notation is:  "Could use 11.5% - 12.5%".  After he completed a draft of the first of those appraisal reports (stating a reduction in the property's fair market value of 11%), he mailed a copy to Mr. McClain, asking him to critique it and offer feedback.  In response, he received an email from Mr. McClain stating:  "Your appraisal is excellent!  For clarity you may wish to restate your reasoning in the concluding paragraph.  Please see attached as a possibility.

**[*9]** Your call!" Almost verbatim, Mr. McClain's suggestion appears in the

Hanlon appraisal and in earlier appraisals.[2]

Subsequently, on March 5, 2004, after he had completed eight reports with

respect to contributions of facade easements to NAT, Mr. Hanlon received an

email from Anna C. Bookwalter, NAT's director of operations, in which she wrote:

> I am writing in regard to the 8 appraisals you have done for the
> National Architectural Trust * * *.
>
> After reviewing these appraisal reports you seem to have a good
> grasp of the material needed to support your easement valuation.  As
> an addendum to the report, we require that each appraiser insert the
> easement document.  As you have already referenced it in your report,

---

[2]The suggested wording (almost verbatim) is emphasized in the following
extract from the Hanlon appraisal.

> The estimated fair market value of the property as of January 20,
> 2004, is $1,840,000.  In determining the value of the easement, I have
> taken into account the current city ordinances and laws that apply in
> the City of Boston which are less restrictive than the preservation
> deed restriction.  I have also considered the additional restrictions
> imposed on the property by the preservation deed restriction.  Based
> upon the guidelines set forth by the Internal Revenue Service, in a
> heavily regulated market like Boston, the lower end of the range is
> considered more appropriate since the market value impact of this
> modification of the bundle of rights on value would likely be less
> than in minimally regulated markets.  The property is considered to
> have a reduction in fair market value of 12% of the property's value
> prior to the easement donation, which equates to a loss of $220,800
> (rounded).

**[*10]** no additional information is required in the text, just the document itself, which I have attached.

We will add it to the 8 reports we already have, but please add it to all future reports you do for our clients. If you have any questions about easement appraisals, feel free to call me. Thanks for your help and we look forward to working with you in the future.

Gordon Kaufman's Concerns as to Value

Lorna Kaufman testified that, as between her and Gordon Kaufman, he took the lead in facilitating the contribution of the facade easement to NAT.

By email dated February 6, 2004, to Mr. Bahar, Gordon Kaufman expressed his concern that "the reduction in the resale value of the property due to the [facade] easement [is] so large as to overwhelm the tax savings that accrue from it." He asked Mr. Bahar: "[D]o you have statistical documentation that bears on how much of a reduction in resale value takes place for residential properties?" Mr. Bahar responded by email of the same date, reassuring him as follows:

> Impact of the Facade conservation easements on the value of the property
>
> 1. In areas that are regulated by local historic preservation ordinances and bodies such as Boston historic neighborhoods (including yours) * * * properties with an easement are not at a market value disadvantage when compared to other properties in the same neighborhood.

In support of his conclusion, Mr. Bahar set forth the following data:

[*11] 2.  We have tracked 26 resold properties to-date on which we held an easement, and none was resold at a loss or had any issues for resale that we are aware of.

3.  Over 100 lenders have approved to subordinate their loans to our easements to-date in over 800 cases.  * * * Why would these banks (including yours) approve these transactions if they saw a risk or adverse financial impact on their collateral??

\*        \*        \*        \*        \*        \*        \*

7.  One of our directors, Steve McClain, owns fifteen or so historic properties and has taken advantage of this tax deduction himself. He would have never granted any easement if he thought there would be a risk or loss of value in his properties.

Mortgage Subordination

Before entering into the preservation agreement, Lorna Kaufman needed the agreement of Washington Mutual Home Loans (Washington Mutual) to subordinate its mortgage interest in the property to NAT's interest with respect to the facade easement.  To obtain that subordination, both petitioners executed and submitted a statement to the Washington Mutual containing the following paragraph.

The easement conveys the right of prior approval of any future changes I wish to make on the exterior of the property.  The Laws of _____ already require government approval based on historic preservation criteria.  The easement restrictions are essentially the same restrictions as those imposed by current local ordinances that govern this property.

**[*12]** Petitioners' Tax Returns

Petitioners filed joint Federal income tax returns for 2003 and 2004 (2003 return and 2004 return, respectively). On the 2003 return, petitioners reported a charitable contribution of $220,800 for the contribution of the facade easement. Before they filed the 2003 return, petitioners provided a copy of the Hanlon appraisal to their long-time accountant, David Cohen, who reviewed it and found that it was consistent in form with other real estate appraisals that he had seen. Because of the limitations on charitable contribution deductions in section 170(b)(1)(C), petitioners claimed a charitable contribution deduction with respect to the facade easement of only $103,377. On the 2004 return, petitioners claimed a carryover charitable contribution deduction of $117,423 with respect to the facade easement contribution.

Respondent's Examination

Respondent examined the 2003 and 2004 returns and, among other adjustments, disallowed any deduction for the contribution of the facade easement to NAT on, among other grounds, the ground that petitioners had failed to establish the value of the contributed easement. Respondent also determined the accuracy-related penalties in question. Petitioners have assigned error to respondent's determination of the resulting deficiencies in tax and to the penalties.

**[*13]** <u>Respondent's Expert</u>

In preparing for the trial of this case, respondent retained the services of John C. Bowman III. Mr. Bowman has been certified by the Commonwealth of Massachusetts as a State-certified general real estate appraiser. He has received a Certificate of Completion for the Valuation of Conservation Easements program offered by the American Society of Appraisers (and other organizations) and is endorsed by the Land Trust Alliance. His appraisal work includes a particular emphasis on conservation and preservation restrictions. He has served on the Boston Landmarks Commission for 10 years, serving as chairman of the commission for 6 years. He has extensive experience appraising partial interests in real property, including conservation easements.

Mr. Bowman was retained by respondent to review the Hanlon appraisal and to state his own view of the value of the facade easement. In advance of his being retained by respondent, respondent's counsel provided Mr. Bowman with copies of (1) the Hanlon appraisal and (2) an appraisal of the value of the facade easement prepared by Joan Gootee (Gootee appraisal), an IRS employee. In his proposal for expert witness services, Mr. Bowman expressed preliminary views as to both appraisals. With respect to the Hanlon appraisal, he stated:

[*14] In developing his opinion of the value of the facade easement the appraiser acknowledged that "development potential is not hampered as the property is currently improved to its highest and best use as a single-family dwelling." Despite recognizing there would be no change in the highest and best use of the property, the appraiser made an extraordinary assumption that the facade easement would result in a diminution in value.

First employing the sales comparison approach to develop an opinion of the property value as unencumbered (before value), he then applied a percentage discount to the before value to calculate the value of the facade easement. The only support for the percentage discount is a reference to an IRS memorandum. No appraisal of the after value was performed so there was no paired sales data analysis in support of an adjustment to otherwise comparable sales to make them more comparable to the subject as encumbered by the facade easement. Despite referencing the before and after method as the correct method to be used in appraising conservation easements, the appraiser inexplicably employed an inappropriate methodology.

With respect to the Gootee appraisal, he stated:

I also read the review appraisal report prepared by Joan Gootee of the IRS. I agree with the reviewer that the application of a discount percentage to the before value is not the appropriate appraisal methodology for the valuation of the facade easement. I also agree with the reviewer that the provisions of the facade easement are duplicative of the underlying restrictions of the South End Landmark District. Thus encumbrance by the facade easement would likely have no measurable impact on the after value of the property, resulting in only a nominal facade easement value.

Mr. Bowman is of the opinion that the grant of the facade easement to NAT did not reduce the value of the property at all. In other words, in his opinion, the value of the facade easement is zero.

**[*15]**                                     OPINION

I.      Burden of Proof

In general, the taxpayer bears the burden of proof.  See Rule 142(a)(1).

Section 7491(a)(1), however, shifts the burden of proof to the Commissioner if the

taxpayer both satisfies the preconditions set forth in section 7491(a)(2) and

introduces credible evidence with respect to any factual issue relevant to

ascertaining the taxpayer's proper tax liability.  Petitioners argue that Mr. Hanlon's

testimony represents credible evidence that the value of the facade easement was

$220,800 and that, therefore, respondent has the burden of proving that it was not.

Respondent objects that Mr. Hanlon's testimony is not credible, nor have

petitioners satisfied the preconditions set forth in section 7491(a)(2).

Valuation does not present exclusively questions of fact.  As the Supreme

Court stated recently in United States v. Woods, 571 U.S. __, __, 134 S. Ct. 557,

566 (2013):

> [W]e doubt that "value" is limited to factual issues and excludes
> threshold legal determinations.  Cf. Powers v. Commissioner, 312
> U.S. 259, 260 (1941) ("[W]hat criterion should be employed for
> determining the 'value' of the gifts is a question of law"); Chapman
> Glen Ltd. v. Commissioner, 140 T.C. No. 15, 2013 WL 2319282, at
> *17 (2013) ("[T]hree approaches are used to determine the fair market
> value of property," and "which approach to apply in a case is a
> question of law").  * * *

[*16] It is possible, however, that, when all threshold questions of law have been settled or are not in dispute, there may remain no dispute as to the operative facts and documents.  In this case, because we are able to resolve the valuation question on the basis of essentially agreed facts along with the assistance we may find helpful in the parties' expert's opinions, we need not resolve the burden of proof issue raised by petitioners.  See Estate of Jelke v. Commissioner, T.C. Memo. 2005-131, 2005 WL 1277407, at *4, vacated and remanded on another issue, 507 F.3d 1317 (11th Cir. 2007); see also Deskins v. Commissioner, 87 T.C. 305, 322-323 n.17 (1986); Payne v. Commissioner, T.C. Memo. 2003-90, 2003 WL 1620725, at *6.[3]

---

[3]As a bit more explanation as to why we need not here be concerned with who bears the burden of proof, consider the following.  "[T]he placement of the burden of proof * * * would be controlling only if, as a matter of law, the evidence presented by the parties must be deemed of equal weight."  Brookfield Wire Co. v. Commissioner, 667 F.2d 551, 553 n.2 (1st Cir. 1981), aff'g T.C. Memo. 1980-321.  As this Court has stated: "[E]xcept for extraordinary burdens (e.g., in fraud cases), the burden of proof is merely a 'tie-breaker' * * * [it] is irrelevant unless the evidence is in equipoise."  Steiner v. Commissioner, T.C. Memo. 1995-122, 1995 WL 121410, at *27.  Although assignment of the burden of proof is potentially relevant at the outset of any case, where (as in this case) the Court finds that a preponderance of the evidence favors one of the parties, the case is not determined on the basis of which party bore the burden of proof, and the assignment of burden of proof becomes irrelevant.  See Kean v. Commissioner, 91 T.C. 575, 601 n.40 (1988) ("Our determinations have been made on the basis of the preponderance of the evidence; accordingly, it is immaterial * * * who bears the burden of proof. Deskins v. Commissioner, 87 T.C. 305, 323 n.17 (1986).").

[*17] The question of who bears the burden of proof with respect to the penalties is different. Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is proper to impose penalties. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). However, if the Commissioner has met his burden of production, the burden of proof remains with the taxpayer, including the burden of proving that the penalties are inappropriate because of reasonable cause. Id. at 446-447.

II.    The Value of the Facade Easement

    A.    Introduction

    Section 170 allows a deduction for charitable contributions. In general, section 170(f)(3) denies a deduction for a charitable contribution of an interest in property that is less than the taxpayer's entire interest in the property. One exception to that general rule, however, is for a qualified conservation contribution. See sec. 170(f)(3)(B)(iii). We assume that by delimiting the question before us with respect to Lorna Kaufman's contribution of the facade easement to NAT to the diminution in value, if any, of the property on account of that contribution, the parties agree that the contribution constituted a qualified conservation contribution, to a qualified organization, of a qualified real property

**[\*18]** interest constituting, in particular, a perpetual conservation restriction. See sec. 170(h)(1); sec. 1.170A-14(b)(2), Income Tax Regs. We will, therefore, proceed directly to the question of value.

Section 1.170A-14(h)(3)(i), Income Tax Regs., addresses the proper method for valuing a contribution of a perpetual conservation restriction. The value of the contribution is the fair market value of the perpetual conservation restriction at the time of the contribution. If there is no substantial record of sales of easements comparable to the donated easement, generally the fair market of the donated restriction "is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction." Id.

Petitioners defend the $220,800 value for the contribution reported on the 2003 return. Respondent believes that the facade easement had no value when it was conveyed to NAT.

B.    Arguments of the Parties

1.    Introduction

The parties defend their respective valuations on the basis of expert and other testimony and, for petitioners, by reference to the preservation agreement and to an appraisal report by William J. Pastuszek, Jr.

[*19]     2.     <u>Petitioners' Witnesses and Reports</u>

          a.     <u>Mr. Hanlon</u>

               i. <u>Introduction</u>

Petitioners offered, and the Court accepted, Mr. Hanlon as an expert on valuation.  We received the Hanlon appraisal as Mr. Hanlon's direct testimony.[4] As stated, Mr. Hanlon is of the opinion that the value of the property before the grant of the facade easement to NAT was $1,840,000.  Mr. Hanlon reached that conclusion principally on the basis of a sales comparison analysis, pursuant to which he analyzed data from sales of three comparable properties (none encumbered by a facade easement), all located near the property.  He did not express an opinion as to the value of the property after grant of the easement, but he was of the opinion that "[t]he property is considered to have a reduction in fair market value of 12% of the property's value prior to the easement donation, which equates to a loss of $220,800 (rounded)."  He therefore concluded that the fair market value of the facade easement was $220,800.

---

[4]Generally, we receive an expert's written report into evidence as his direct testimony.  Rule 143(g)(1) and (2).

**[*20]**                                    ii. <u>South End Standards and Criteria</u>

Mr. Hanlon ascribes the reduction in fair market value of the property to the burdens imposed on Lorna Kaufman (and subsequent owners of the property) by the preservation agreement. He recognizes that the property, like "[a]ll residential buildings in Boston", is subject to substantial regulation, including building codes and zoning laws, and that, because of its location in Boston's South End, it is additionally subject to the South End Standards and Criteria.

The South End Standards and Criteria state that they are intended "to preserve the physical features, architectural character and appearance of the South End". With certain exceptions, they require approval by the South End Landmarks Commission (commission) for all exterior alterations to any property within the landmark district. They authorize the commission to issue a certificate of design approval when it determines that proposed exterior alterations conform to the South End Standards and Criteria. They provide that no building permit may be issued for exterior alterations unless accompanied by a certificate of design approval from the Commission. They provide specific repair criteria for many elements of the exterior of a residential building, e.g., stairs, entrances, exterior walls, windows, window openings and trim, bay, oriels and protrusions from walls, roofs, signs, and utility and mechanical equipment. The detail of the

[*21] specific repair criteria is illustrated by the criterion for railings, balustrades and decorative balconies.

> Existing cast iron stair railings, balustrades and decorative balconies shall be retained.  If they are badly deteriorated or non-existent, replacement elements must be of a size and massiveness consistent with the remaining original elements of the design or consistent with the size, massing, profile and complexity of remaining examples of iron work on nearby buildings.  Simplified adaptions may be allowed if they meet the above criteria.  All iron work should be black in color.  * * *

### iii.  Overlap

Mr. Hanlon concedes that there is much overlap between the burdens imposed on the owner of the property by the preservation agreement and the burdens imposed on the owner by preexisting restrictions, particularly those found in the South End Standards and Criteria.  And while he believes that "changes or alterations to the facade of the subject property * * * [were] already strictly regulated", he also believes that "the Preservation Restriction Agreement imposes stricter controls than those contained in the Landmark Commissions Standards and Criteria."  He concludes:  "Properties encumbered by the Preservation Restriction Agreement should sell at a penalty relative to unencumbered properties in similar locations."  His principal argument that the preservation agreement imposes stricter controls is as follows:

[*22] Unlike the South End Landmark Commission's Standards and Criteria, the Preservation Agreement applies to more than just the exterior walls, roof, and yard which are visible from the public way. The agreement's broad definition of facade includes all exterior walls, chimneys and roofs of the building and the land the building is situated upon, imposing additional restrictions on the property over and above those of the South End Landmark Commission.

He catalogs what he believes to be the comparative disadvantages (affecting the value of the property) of the preservation agreement.

Some changes to the property which may be permitted by the South End Historic District Standards and Criteria may not be allowed by the National Architectural Trust. The Preservation Restriction Agreement easement is granted in perpetuity while the historic district ordinances and local zoning practices may change over time to reflect changes in political, economic and aesthetic needs and tastes in a community. The Historic District ordinances contain relief for economic hardship, which the Preservation Restriction Agreement does not. The Preservation Restriction Agreement may result in higher insurance and property maintenance costs than those on properties not so encumbered. Rehabilitation costs may be higher also as the property owner could be obligated to restore or replace deteriorated materials rather than replace them with cheaper substitute materials. The requirement of obtaining consent prior to commencing any exterior work on the property could result in delays in construction and implementation of plans. The property owner is subject to the inconvenience of periodic inspections of the facade to assure compliance with the easement agreement and is at risk for legal action to compel compliance with the terms of the easement agreement in the event of a violation. Marketability could be affected as a segment of the buying public may show resistance to being subjected to yet additional limitations and restrictions on their property rights. Marketability may be further diminished as future buyers, in the event the Preservation Restriction Agreement is ever extinguished, could bear the financial burden of having to pay back to

[*23] the National Architectural Trust the full amount of the donation upon any subsequent sale of the property. Resale value could also be diminished because future owners are not able to benefit from the substantial tax savings associated with the granting of a historic facade easement. The potential for the greatest loss of value is attributable to the National Architectural Trust's right to circumscribe the owner's rights to utilize the property for its "highest and best use", even if legally permissible. The loss of potential for demolition for assemblage, subdivision or alternative use could have dramatic financial implications. Although the subject property is severely restricted by pre-existing regulations, any consideration of the possibilities of variances and special permits is made moot by the Preservation Restriction Agreement.

Notwithstanding those supposed comparative disadvantages of the preservation agreement, Mr. Hanlon concedes that neither the preservation agreement nor the preexisting restrictions hamper the potential for developing the property to its highest and best use "as the property is currently [i.e., at the time of the preservation agreement] improved to its highest and best use as a single family home."

## iv. Mr. Hanlon's Method

Mr. Hanlon found no record of sales in Massachusetts of easements comparable to the facade easement. He understood that, where no established market exists for easements, conservation restrictions are typically valued indirectly by the difference between the fair market value of the burdened property before and after the grant of the restriction. Because Mr. Hanlon was unaware of

[*24] any sales in the Boston area of residential properties encumbered by facade easements, he was unable to determine the value of the property following the contribution of the facade easement to NAT using comparable-sales data. Mr. Hanlon had seen a document posted on a U.S. Department of the Interior, National Park Service Web site that reproduced an article entitled "Facade Easement Contributions", prepared by Mark Primoli (Primoli article), an IRS employee. The Primoli article includes the following sentence (which Mr. Hanlon quoted in his appraisal): "Internal Revenue Service Engineers have concluded that the proper valuation of a facade easement should range from approximately 10% to 15% of the value of the property." He also believed that court cases had consistently decided that conservation easements had a value, typically in the range of 10% to 20% of the value of the encumbered property. Although the Primoli article does not say so, Mr. Hanlon believes the range set forth in the article--from approximately 10% of value of the encumbered property to approximately 15% of that value--to be appropriate to properties (such as the property) situated in historic districts already subject to architectural restrictions. He believes that, in heavily restricted areas, additional restrictions would have less of an impact on the value of the encumbered property and that, in lightly restricted areas, they would have a greater impact on the value of the property. He believes that the percentage

**[*25]** reduction in value of the property on account of the contribution of the facade easement to NAT fell somewhere between 10% and 15%.

To determine the appropriate percentage within that range, Mr. Hanlon first made a list of the additional burdens that he believed would affect the value of a residential property already developed to its highest and best use (i.e., as a residence) if the owner encumbered the property with a facade easement. Assuming that, in lightly restricted areas, those burdens would reduce the value of the burdened property by the full 15% upper bound of the range, he assigned a percentage to each of the burdens so that if each percentage were fully applied the sum of the percentages would be 15%. His list, and the assigned percentages (totaling 15%), is as follow:

(1) loss of development potential: 0%;

(2) additional regulation and bureaucracy: 2%;

(3) regulation on end walls: 0.25%;

(4) new regulation on rear and roof: 0.5%;

(5) diminishing of marketability: 2%;

(6) recapture:[5] 0.5%;

---

[5]Explained by Mr. Hanlon as the recapture by NAT of a portion of the value of the property if the facade easement is extinguished and the property

(continued...)

**[*26]** (7)    maintenance and insurance requirements in excess of unencumbered properties: 1.25%;

(8)    legal exposure if easement is breached: 0.5% ;

(9)    loss of right of future owners to receive tax benefits of easements: 4.5%;

(10)  new strict regulation of front facade: 1.5%;

(11)  new regulation of yard and yard improvements: 0.5%; and

(12)  restrictions on expansion of building: 1.5%.

He based those percentages on his judgment, experience, and, at least in the case of burden (5) ("diminishing of marketability"), "common sense" that more burdened property would sell for less. He presented no numerical data or statistical analysis supporting the particular percentage he assigned to any of the 12 burdens. His next step in reaching his conclusion that contribution of the facade easement to NAT reduced the fair market value of the property by 12% was to compare the South End Standards and Criteria and the preservation agreement and to make a list of what he thought to be the differences and similarities between the two. He then adjusted the percentages he had determined in the first step to reflect those differences and similarities. He increased to 0.75% the weight

------

[5](...continued)
subsequently sold.

[*27] accorded to burden (4), new regulation on rear, and roof (because of roofing materials specified in the preservation agreement), and he accorded no weight to burdens (3), regulation on end walls (since the encumbered building was mid-block), (10), new strict regulation of front facade (since the preservation agreement imposed no additional burden), and (12), restrictions on expansion of building (since the property was developed to its highest and best use).

In response to a question from the Court, Mr. Hanlon acknowledged that his deconstruction of the 15% upper bound of the range in the Primoli article into smaller, particular percentages reflective of the separate burdens imposed by a facade easement was a method unique to him and was not a generally accepted appraisal practice or valuation method.

### b. Pastuszek Report

Mr. Pastuszek, a Massachusetts certified real estate appraiser, prepared an appraisal report (Pastuszek report) in which he used a matched sales analysis[6] to examine the effects of NAT's preservation restriction agreements on real property

---

[6]For purposes of his report Mr. Pastuszek defines "matched sales analysis" as "a comparison and analysis, using accepted appraisal methodologies, of sales of residential properties encumbered by a perpetual historic preservation restriction (or other comparable or analogous perpetual easement or restriction) compared to one or more sales of comparable residential properties that are not encumbered by such restriction."

**[*28]** prices in the Boston area. Mr. Pastuszek did not appear, and the Pastuszek report was admitted solely for purposes of demonstrating that the question of valuation is focused on the property at issue and that facade easements do not have a zero value as a matter of law.

### 3. Respondent's Witness

#### a. Mr. Bowman

Respondent offered, and the Court accepted, Mr. Bowman as an expert in appraising partial interests in property. We received his written report (Bowman report) as his direct testimony. The report is styled "Summary Appraisal Review Report Including Reviewer's Opinion of Value". Mr. Bowman states that his assignment from respondent had two parts: (1) to review the analysis and reasoning of the Hanlon appraisal, evaluate the adequacy of the supporting data, and opine whether the valuation was credible, properly supported, and developed in accordance with generally accepted valuation principles and standards and (2) to opine as to the fair market value of the facade easement.

#### b. Appraisal Review

##### i. Introduction

Mr. Bowman's opinion of the Hanlon appraisal (i.e., the $220,800 value that Mr. Hanlon determined for the facade easement) is as follows: "As the fruit of an

[*29] inappropriate valuation methodology employing a wholly unsupported adjustment factor, the preservation restriction value of the Hanlon appraisal cannot be said to be reasonable or credible." Mr. Bowman's reasons for reaching that conclusion are as follows.

### ii. Flaw in Method

Mr. Bowman believes that the preservation agreement resulted in the subdivision of Lorna Kaufman's fee interest in the property into two partial interests in the property and that Mr. Hanlon's appraisal task "should have been to estimate the value of a partial interest, the preservation restriction, which is an easement in gross." There being no market for perpetual conservation restrictions, Mr. Bowman believes that Mr. Hanlon should have accomplished that task by employing a three-step, two-appraisal procedure. The first step would be to determine by appraisal the precontribution value of the property. The second step would be to determine by a second (independent) appraisal the postcontribution value of the property. The third step, if the difference between the first and second determined values was negative, would be to assign that difference to the value of the partial interest in property (the facade easement) contributed to NAT. That, he states, would be consistent with the three-step procedure both suggested in section

[*30] 1.170A-14(h)(3)(i), Income Tax Regs., and generally employed by appraisers in valuing partial interests in property.

Mr. Bowman criticizes Mr. Hanlon for failing to take the second step; i.e., for not conducting a second appraisal of the property to determine its postcontribution value. And while Mr. Bowman recognizes that Mr. Hanlon did determine both pre- and post-contribution values of the property, he emphasizes that Mr. Hanlon determined the postcontribution value not by appraisal but by discounting the precontribution value that he had determined to reflect the range of discounts set forth in the Primoli article, which Mr. Hanlon modified to reflect his opinion of the added burdens imposed by the preservation agreement (over those imposed by the South End Standards and Criteria). He believes that Mr. Hanlon's method was flawed because Mr. Hanlon did not determine the postcontribution value of the property independently from his determination of the precontribution value of the property. In his opinion, relying on the Primoli article to determine a discount to be applied to the precontribution value of the property to estimate its postcontribution value "is not a valid methodology for the appraisal of partial interests."

**[*31]**                                    iii.  Mr. Hanlon's Assumptions

Aside from his criticism of Mr. Hanlon's method, Mr. Bowman questions Mr. Hanlon's basis for discounting the precontribution value of the property by 12% to determine its postcontribution value.  He states:  "Hanlon offers no data to support either the direction or magnitude of this discount."  He finds extraordinary Mr. Hanlon's assumption that "[p]roperties encumbered by the Preservation Restriction Agreement should sell at a penalty relative to unencumbered properties in similar locations."  He addresses under five headings the factors that he understands Mr. Hanlon to have considered as contributing to the discount that he applied to the precontribution value of the property.

Stricter Controls Result in Loss of Value.  Mr. Bowman refers to a 2005 study by N. Edward Coulson and Michael L. Lahr, "Gracing the Land of Elvis and Beale Street:  Historic Designation and Property Values in Memphis", 33 Real Est. Econ. 487 (2005),[7] which concludes that the owners of properties in a more restrictive local historic district enjoyed greater returns (more rapidly increasing property values) than did owners of properties in less restricted local historic districts or in national historic districts.  Mr. Bowman believes that the study

---

[7]An online version of the study was published in 2004 and can be found at http://policy.rutgers.edu/faculty/lahr/Coulson&Lahr_July%202004_Memphis_RE Economics.pdf (last visited Nov. 6, 2013).

[*32] implies that buyers value the additional preservation restrictions in the more restrictive local district.[8] To him "[the study] suggests that a potential buyer of a preservation restriction-encumbered property does not see any less value in the property even if the terms of the preservation restrictions are more strict than the regulations governing the historic district."

The Restriction Constrains Highest and Best Use. Mr. Bowman points out that Mr. Hanlon acknowledges that there is no change in the highest and best use of the property on account of the preservation agreement. He adds: "As a matter of zoning, the property already exceeds the maximum allowable building envelope."

The Restriction Is Inflexible. In part, the preservation agreement provides that "nothing contained herein shall be construed to limit the Grantee's right to give its consent (e.g., to changes in the facade) or to abandon some or all of its

---

[8]Mr. Bowman believes that homeowners in a historic district place premium value on the assurance that the neighborhood surrounding their houses will remain unchanged over time:

> [The] assurance the neighborhood will not change in character has value because the neighborhood condition impacts homeowner value in the form of an externality. A well-maintained property will not be as valuable in [a] neighborhood of poorly maintained properties as it would be if the surrounding area were similarly well preserved. Regulation of appearance in an historic district produces positive neighborhood effects on value.

[*33] rights hereunder." Mr. Bowman states that, in 2003, NAT distributed a document --Commonly Asked Questions About Conservation Easements (NAT Q&As)--to prospective appraisers in the Boston area. To the question "What criteria does the Trust use when reviewing a prospective change?", NAT answers: "The Trust follows the 'Secretary of the Interior's Standards for Historic Rehabilitation.' In general, the proposed change is acceptable if it is consistent with the property's original architectural style." On the basis of the quotations from the two documents, Mr. Bowman believes that, in approving changes to the property, NAT need not be inflexible and, indeed, it would be no less flexible than would be the commission in approving changes under the South End Standards and Criteria.

The Restriction Imposes Higher Ownership Costs. Mr. Bowman disagrees. He states that Mr. Hanlon provided no evidence of higher insurance or maintenance costs. He believes: "The likely level of maintenance required under the preservation restriction would be what any prudent owner occupant would do to protect their [sic] investment absent the applicability of the historic district guidelines or the preservation restriction." He does not believe that the requirement to obtain consent from NAT before commencing outside work on the property would impose costly delays. He points out that the NAT Q&As state that

[*34] it takes approximately two weeks to obtain approval from NAT for a proposed exterior change to the property. That, he states, is the same period it would take to obtain from the Commission a certificate of appropriateness with respect to any exterior change. He concludes: "[A]n application filed simultaneously with NAT and the * * * Commission could be approved simultaneously two weeks later." Finally, he does not think that the periodic inspection of the property's exterior required by NAT would inconvenience the owner (as his presence is not required), nor does he think that the preservation agreement increases the risk of legal action to enforce its terms: "The property owner is already at risk for legal action by the [City of Boston's] Inspectional Services Department for unauthorized alterations or for failure to maintain (demolition by neglect)."

The Preservation Restriction Limits Marketability. Mr. Bowman disagrees. He includes with his report an article entitled "Using the Historic Facade Conservation Easement Deduction", reprinted from the Practical Real Estate Lawyer (March 2003) and written by James M. Kearns, then president of NAT. The article's lead reads: "By preserving a piece of historic architecture for future generations, the property owner can get a big tax deduction with little cost or risk." With respect to marketability, Mr. Kearns states:

**[*35]** <u>Marketability</u>

When considering whether a conservation easement might interfere with a property's marketability, consider the three overarching factors:

- Donating a conservation easement often places little additional burden on the property owner over that which already exists from the local governing authority;

- Those who purchase property in historic districts generally value the architectural integrity of all the properties within the community, and buyers of such properties are supportive of regulations guarding historic preservation; and

- Properties in historic districts are uniquely different from each other and few are available on the market at any given time.

Consequently, the presence or absence of an easement is only a minor factor in the buying decision.

Because Mr. Bowman believes that no value is lost in granting a facade easement on property in a local historic district (and, thus, no tax charitable contribution deduction is available on account of the contribution), he believes that subsequent owners would not discount the value of the property on account of the lost opportunity for a charitable contribution deduction. Finally, he believes that, if the facade easement has no monetary value, there would be no payback to NAT in the event it was extinguished.

**[*36]**    c.  Opinion of Value

i. Introduction

Mr. Bowman's opinion is that there was no diminution in the value of the property on account of the contribution of the facade easement to NAT. His opinion follows from certain preliminary conclusions, viz:

- There is no change in the highest and best use resulting from encumbrance by the preservation restriction.

- There is no difference between the terms of the preservation restriction and the underlying South End Landmark Commission Standards and Criteria that would likely be recognized by a typical buyer.

- There is no market evidence of difficulty in marketing or financing preservation restriction-encumbered properties.

- The evidence does not demonstrate a market recognition of diminution in value.

His final conclusion is that, since the precontribution value of the property ($1,840,000) is equal to its postcontribution value (the same), the value of the facade easement was zero.

ii. Procedures Mr. Bowman Followed and Precontribution Value

Mr. Bowman states that, to determine the value of the facade easement, he followed the procedures outlined in section 1.170A-14(h)(3)(i), Income Tax Regs.

[*37] Finding no substantial record of sales of easements comparable to the facade easement, he looked to the difference between the pre- and post-contribution values of the property to determine the value (if any) of the facade easement. He agrees with Mr. Hanlon that the highest and best use of the property before the contribution was as a single-family dwelling, and he concurs with Mr. Hanlon's conclusion based on his sales comparison analysis that the precontribution value of the property was $1,840,000. He did no sales comparison analysis to determine the postcontribution value of the property because, like Mr. Hanlon, he could find no properties both burdened by a preservation restriction and sold contemporaneously with the contribution of the facade easement to NAT.

### iii.  Postcontribution Value

As stated supra, Mr. Bowman believes that the highest and best use of the property did not change on account of the contribution of the facade easement to NAT. Taking that use into consideration, he believes that the sales of unencumbered properties found by Mr. Hanlon may without further adjustments serve as comparable sales to determine the postcontribution value of the property. He explains:

> Although none of the comparable West Newton Street sales is encumbered by a preservation restriction, I conclude that the typical buyer would find the restrictions of the preservation restriction no

[*38] more burdensome than the underlying South End Landmark District Standards and Criteria.

To reach that conclusion, Mr. Bowman compared the South End Standards and Criteria with the preservation agreement on a component by component (comparing, for example, restrictions on alteration, replacement standards, maintenance requirements, permitting, and access requirements). He found the components of the preservation agreement to be "basically duplicative" of, and "not materially different" from the South End Standards and Criteria. He believes that exterior work approved under the South End Standards and Criteria would meet the standards of the preservation agreement and that permitting for one set of restrictions would serve for the other. He recognizes that the preservation agreement requires additional (replacement cost) insurance coverage, which he believes a prudent homeowner would be wise to carry in any event. He likewise believes that a prudent homeowner would maintain his home to the standards required by the preservation agreement.

Making no further adjustments to the precontribution comparables, he concluded that the postcontribution value of the property was identical to its precontribution value, viz, $1,840,000.

**[\*39]**                              iv. <u>Resale Study</u>

To rebut Mr. Hanlon's opinion that encumbering a property with a

preservation restriction diminishes the marketability of the property, Mr. Bowman

obtained and analyzed data concerning sales and resales of residential properties

in the Boston area.  He was looking to see whether encumbering a property with a

preservation restriction reduced its marketability.  His approach was to first

identify properties for which information was available showing both the sale

price of the property before encumbrance with a conservation restriction and the

resale price of the property after encumbrance.  He then compared the differences

between the individual sale and resale prices of an appropriate sample of those

properties with the differences between the individual sale and resale prices of the

population of properties sold during the same period.  He was looking to see

whether encumbering a property with a conservation restriction affected the

change in value of the property over time as compared to the change in value of all

properties over time.  He looked for sales of conservation restriction encumbered

properties in three historic districts in Boston, viz, Beacon Hill, Back Bay, and the

South End.  He found seven sales of properties encumbered by preservation

restrictions conveyed to NAT, and he used six of them.  All of those sales occurred

after the date of the preservation agreement.  Three of the six sales were of

[*40] properties in the South End historic district.  He compared the prices at which each property sold before being encumbered to the price at which it sold after having been encumbered.  For all six sales, the postencumbrance sale price exceeded the preencumbrance sale price.

Standard & Poor's Case-Shiller Home Price Indices are indices measuring changes in the prices of single-family, detached residences using the repeat-sales method, which compares the sale prices of the same properties over time.  The indices track such price changes both nationally and in various metropolitan areas, including Boston.  For each of the six properties, Mr. Bowman compared the appreciation over the holding period of the property with the Case-Shiller Index for upper-tier residential real properties in Boston for the same period.  For four of the six properties, appreciation over the holding period exceeded the change in the Case-Shiller Index for the same period.  For two of the six properties, total appreciation was less.  The median year-to-year appreciation rate among the six properties was 8.1%, which exceed the 5.5% median year-to-year rate for the index the same period.  On the basis of his analysis, he concludes:  "[N]o downward adjustment to an unencumbered comparable sale is necessary to make that sale more comparable to an encumbered property."  On the basis of that analysis, he further concludes that Mr. Hanlon was wrong in suggesting that

**[*41]** preservation restrictions diminish marketability: "The analysis of these six preservation restriction-encumbered properties indicates that they were in fact marketable".[9]

### v. Interviews

As a check on his conclusions, he interviewed the buyers of four of the six properties, "each of whom", he reports, "said the preservation restriction did not affect their offering price." He also interviewed three brokers, who, he concedes, had little experience from which to form an opinion about the impact of preservation restrictions. He reports that the consensus of their opinions "was that preservation restrictions in a historic district would likely have no effect on the marketability, that is, either on buyer interest or time on the market, or on the ability of a buyer to obtain a mortgage."

### vi. Literature Search

He did a literature search, and he concludes:

Valuation literature on the influence of historic designation on property value overwhelmingly points to a neutral to positive value effect. Studies of historic district regulation offer no systematic

---

[9]Recognizing that some buyers might perceive that the preservation agreement diminished value, Mr. Bowman notes: "[U]nless all potential buyers perceive a value diminution from the preservation restriction, the sale price will be set by buyers who do not recognize a diminution."

[*42] evidence that markets have priced homes in historic districts at a discount to reflect the additional burden of regulation.

Instead, the results suggest that properties burdened by historic district regulation outperform comparable properties not subject to historic district regulation.  * * *

He believes:

Logically, it is unlikely that buyers in a historic district would value the restrictions of a preservation restriction 180 degrees differently, that is, as diminishing property value.

The purpose of a preservation restriction, continuity, is the same as the purpose of a historic district.  The Coulson and Lahr study in Memphis [supra] suggests that a potential buyer of a preservation restriction-encumbered property does not see any less value in the property even if the terms of the preservation restrictions are more strict than the regulations governing the historic district.

### vii.  Conclusions From Resale Study

Mr. Bowman summarizes the conclusions he draws from his resale study as follows.

My analysis of resales of preservation restriction-encumbered properties indicates that in this market neither buyers nor lenders have shown resistence to properties encumbered by such preservation restrictions.

Based on my analysis of preservation restriction-encumbered sales I conclude no downward adjustment to an unencumbered comparable sale is necessary to make that sale more comparable to an encumbered property.

**[*43]** Stepping back from those conclusions, he states what he would have to believe to be true to accept Mr. Hanlon's opinion that a preservation restriction on a property in a local historic district diminishes the value of that property.

> I would have to believe a potential buyer recognizes a marginal difference in the respective restrictions, quantifies them as an additional cost of ownership over the holding period that they then apply as a discount to their perception of the unencumbered value to result in their offer for the encumbered property.
>
> However, it is unlikely that buyers would perceive an additional cost as a certainty and factor that into their offer. Given that I, an appraiser and real estate developer with 30 years of experience in the field do no[t] perceive any additional cost associated with the preservation restriction, it is even less likely that a typical buyer would perceive such a cost.
>
> The assumption that if there is a difference in applicable restrictions there is a difference in value is incorrect. There is a difference in value only, when the collective judgment of the market recognizes a difference. There can be a distinction without a difference in value.

### viii. Conclusions as to Value

Mr. Bowman concludes:

> In my opinion, the encumbrance on 19 Rutland Square by the facade easement preservation restriction cannot be seen to discernibly affect the value of the property. I find that the after value was equal to the before value.

|  |  |
|---|---|
| Before value | $1,840,000 |
| - After value | 1,840,000 |
| = Preservation restriction value | 0 |

**[\*44]** I conclude that there was no market value associated with the facade easement preservation restriction as of December 31, 2003.

C.      Mr. Bowman's Objectivity

In his proposal for expert witness services, Mr. Bowman expressed his preliminary views, set forth supra, with respect to both the Hanlon appraisal and the Gootee appraisal.  On the basis of those preliminary views, petitioners complain:  "Respondent proffered an expert who began his work to appraise the facade easement donation at issue here with a foregone conclusion that the easement had zero value."

Proceedings in this Court are conducted in accordance with the Federal Rules of Evidence.  See sec. 7453; Rule 143(a).  Rule 702 of the Federal Rules of Evidence states in part that expert opinion is admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue".[10]  An expert whose

---

[10]The full text of Fed. R. Evid. 702 is as follows:

Rule 702.  Testimony by Expert Witnesses

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(continued...)

**[*45]** statements indicate a lack of objectivity is not useful to the Court.  <u>See</u>

<u>Estate of Halas v. Commissioner</u>, 94 T.C. 570, 577 (1990) ("[E]xperts may lose

their usefulness and credibility when they merely become advocates for one

side.").  In his proposal, Mr. Bowman did review the two appraisals he had been

given by respondent's counsel, apparently as she had requested.  His agreement

with Ms. Gootee's conclusions that the South End Standards and Criteria are

duplicative of the restrictions imposed by the preservation agreement and,

therefore, the latter restrictions would have no measurable impact in determining

the postcontribution value of the property does not indicate a lack of objectivity

but, rather, his intimate knowledge of the South End Standards and Criteria.  He

had served on the Boston Landmarks Commission for 10 years, 6 as chairman.

   We find no fault with Mr. Bowman's objectivity.  The thoroughness of his

report belies any suggestion that he was simply justifying preconceived

conclusions.

_____

   [10](...continued)

   (b)   the testimony is based on sufficient facts or data;

   (c)   the testimony is the product of reliable principles and methods;
         and

   (d)   the expert has reliably applied the principles and methods to the
         facts of the case.

**[*46]** D.     <u>Analysis</u>

    1.     <u>Introduction</u>

The parties agree that, in the absence of a market for perpetual conservation restrictions, the value (if any) of the facade easement should be determined by the before-and-after method outlined in section 1.170A-14(h)(3)(i), Income Tax Regs. The parties rely heavily on expert opinion testimony as to the pre- and post-contribution values of the property.

    2.     <u>Qualifications of Messrs. Hanlon and Bowman</u>

Rule 702 of the Federal Rules of Evidence states that one is qualified as an expert witness "by knowledge, skill, experience, training, or education".

We have no doubt that, on the basis of his credentials set forth <u>supra</u>, respondent's expert, Mr. Bowman, is qualified as offered, i.e., as an expert in appraising partial interests in property.  Mr. Hanlon, on the other hand, was offered only as an expert on valuation, without any particular expertise in appraising partial interests in property.  Nevertheless, one may qualify as an expert witness by dint of knowledge, skill, experience, training, or education.  Indeed, in determining the value of a conservation restriction, we have accepted the testimony of a real estate appraiser with no prior experience in valuing that type of restriction.  <u>Johnston v. Commissioner</u>, T.C. Memo. 1997-475; <u>Losch v. </u>

[*47] <u>Commissioner</u>, T.C. Memo. 1988-230.  What does concern us with respect to Mr. Hanlon's qualification to testify, however, is his close relationship with NAT.  His only experience in appraising facade easements is the nine reports that he did with respect to nine facade-easement contributions to NAT.  He looked to NAT to learn how appraisals of facade easements were done before he attempted the first of those reports, and he submitted a draft of the first report to NAT for validation before he completed it.  He incorporated in his reports wording suggested by NAT.  After he completed eight reports, NAT's director of operations, Ms. Bookwalter, expressed NAT's satisfaction with his work but required that he add a document (the easement document) to all future reports.  The tone of her communication to him suggests that she believed that NAT had a proprietary interest in Mr. Hanlon's reports.  She begins her communication by speaking of "the 8 appraisals you have done <u>for</u> the National Architectural Trust".  (Emphasis added.)  Without asking permission from him, she says that NAT would add the easement document to the reports he had already submitted.  She thanked him for his work and expressed NAT's expectation that it would work with him in the future.

**[\*48]** Moreover, NAT was not indifferent to the values Mr. Hanlon determined, nor was he indifferent to what would please NAT. The Court of Appeals pointed out:

> As indicated by the large cash contributions required of donors, the Trust had a substantial economic incentive for itself in facilitating such conservation easements; and to this end and because of the 10 percent target for donations, it also had a stake in assuring a high valuation. Similarly, the appraiser, who admitted receiving fees for a succession of such appraisals for Trust easements, assuredly had an interest in remaining on the list of those recommended by the Trust to potential donors. [Kaufman v. Shulman, 687 F.3d at 32.]

Mr. Hanlon had what we might describe as a patron in the person of NAT. It made work available to him by putting his name on its list of qualified appraisers; it reviewed and commented on his work, and its views on the range of values for facade easements may have influenced the development of his own views. On the basis of his oral testimony articulating the development of his method for valuing the facade easement, however, we are not persuaded that his objectivity was fatally compromised or that he acted merely as an advocate for NAT's views. See our discussion of objectivity supra pp. 44-45. However, we do not ignore or disregard Mr. Hanlon's closeness to NAT and the singularity of his experience in valuing facade easements for clients and for a patron all interested in establishing high values for the easements; we weigh those factors in the balance

[*49] of whether--and the degree to which--to accept Mr. Hanlon's expert testimony.  See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 222 (1998) (similar resolution concerning closeness of appraiser to his client).

### 3. Mr. Hanlon's Testimony

Mr. Hanlon believes that contributing the facade easement to NAT reduced the value of the property.  Since he lacked sale-price data for sales of either facade easements or residential properties encumbered by facade easements, he could not use the methods of estimating the value of a facade easement approved in section 1.170A-14(h)(3)(i), Income Tax Regs.  He had, however, estimated that the precontribution value of the property was $1,840,000 (an amount not in dispute, which we accept and find).  With only that one data point, he testified that he "was grasping" for some method to value the facade easement.  He had the Primoli article, and he had found repeated references to it.  He had also found court cases showing a range of discounts for perpetual conservation restrictions.  He believed that it was generally accepted appraisal practice to apply a discount within the ranges he had found when sufficient market data was unavailable.  We have described how, to find an in-range discount, he deconstructed the 15% upper bound of the range in the Primoli article into smaller, component percentages reflective of the burdens that he thought were imposed by a facade easement; he

**[*50]** then made adjustments to those component percentages to reflect what he believed to be the differences and similarities between the South End Standards and Criteria and the preservation agreement, concluding that the value of the facade easement was 12% of the precontribution value of the property. He concedes that his deconstruction of the 15% upper bound in the Primoli article into smaller, component percentages reflective of the burdens imposed by a facade easement was a method unique to him and not a generally accepted appraisal practice or valuation method.

Expert testimony must be "the product of reliable principles and methods". Fed. R. Evid. 702(c). Expert witness testimony can be "reliable even though the expert's methodology is not generally accepted in her field." 3 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual, sec. 702.02[5], at 702-19 (10th ed. 2011). Nevertheless, we need not rely on the unsupported opinion of an expert witness. Holman v. Commissioner, 130 T.C. 170, 213 (2008), aff'd, 601 F.3d 763 (8th Cir. 2010). Mr. Hanlon's deconstruction of the 15% Primoli article upper bound depended, first, on his acceptance of 15% as the standard percentage reduction in value of a property in a lightly regulated area on account of the owner's severance and conveyance of a facade easement. He then had to identify the separate burdens that he thought

[*51] were imposed on the owner because of the conveyance of the easement, assigning a percentage value to each so that the sum of the assigned percentages was 15%. Even were we to accept that he identified the constituent burdens constituting the overall burden imposed by a facade easement, we accept neither his 15% starting point nor the relative percentages that he assigned to each constituent burden.

Mr. Hanlon's starting point--that properties in lightly regulated areas suffer a 15% reduction in value on account of the severance and conveyance of a facade easement--is based on neither reliable market data nor specific attributes of the property. It is based on what he believes the courts and the IRS had allowed in prior cases. Whether it is an upper or lower bound, there is no standard percentage to which one may make adjustments to arrive at a value appropriate for a particular property. As we said in Nicoladis v. Commissioner, T.C. Memo. 1988-163, 1988 Tax Ct. Memo LEXIS 187, at *21,

> we do not mean to imply that a general "10-percent rule" has been established with respect to facade donations. There was a fair amount of discussion by the parties at trial about whether the Court had established a "10-percent rule" in * * * [Hilborn v. Commissioner, 85 T.C. 677 (1985)]. We did not there and do not here. Hilborn establishes as acceptable the before and after method of valuation, and while under the circumstances of that case a 10-percent figure

**[*52]** was relied upon, valuation itself is still a question of facts and circumstances. * * *

See also <u>Scheidelman v. Commissioner</u>, T.C. Memo. 2013-18, at *14.

Nor can we accept the component percentages that he assigned to the 12 constituent burdens that he identified. Again, there was no market data. He testified that the assignments of percentages were "just based on [his] judgment." He elaborated that the 2% that he assigned to the burden he identified as "additional regulation and bureaucracy" was based on his judgment and experience in working with buyers and sellers, although on cross-examination he conceded that he had not worked with buyers and sellers who had been considering easement donations. When asked how he came to the conclusion that the marketability of property would be diminished by 2%, he answered: "[I]t's common sense" that the more restricted property "is going to have lower marketability." He did not, however, explain how he got to 2%. He testified that he based the 0.5% that he assigned to "recapture" on "what I felt the limitation on marketability would be." As to the 1.25% he assigned to "maintenance and insurance requirements in excess of unencumbered properties", he admitted that he did no analysis to arrive at that figure and "just chose" it. Similarly, with respect to the 0.5% assigned to "legal exposure if easement is breached": "just judgment."

**[*53]** Simply put, given his limited experience appraising facade easements and his apparent preconception that the component percentages would total 15% in a lightly regulated area, we are not persuaded that Mr. Hanlon's common sense, feelings, and judgment constitute a reliable basis for the percentage reductions in value that he assigned to each of the constituent burdens constituting a facade easement (and, further, the adjustments he made to those percentages to reflect differences between the burdens imposed by the South End Standards and Criteria and the burdens imposed by the preservation agreement).  And while Mr. Hanlon's method of deconstructing the burden imposed by a facade easement into constituent elements and assigning a percentage value to each element is not per se unreliable because it is unique to him and is not a generally accepted appraisal practice or valuation method, the lack of general acceptance and the uniqueness of his method are facts relevant to our determining its reliability, and those facts support our conclusion that his method is not reliable.[11]  See Saltzburg et al., supra, at 702-19 ("general acceptance test * * * is relevant to but not dispositive of admissibility").  Finding his method not to be reliable, we give no weight Mr.

_____

[11]As stated supra, Mr. Bowman, who is experienced in appraising partial interests in property and conservation easements in particular, is of the opinion that, "relying on the Primoli article to determine a discount to be applied to the pre-contribution value 'is not a valid methodology for the appraisal of partial interests.'"

[*54] Hanlon's testimony that the contribution of the facade easement to NAT reduced the value of the property by 12% (i.e., by $220,800).[12]

### 4. The Pastuszek Report

As discussed supra pp. 27-28, Mr. Pastuszek, a Massachusetts certified real estate appraiser, prepared an appraisal report in which he used a matched sales analysis to examine the effects of NAT's preservation restriction agreements on real property prices in the Boston area. At trial, petitioners put the Pastuszek report before the Court as a component of an exhibit that petitioners offered and that was acceptable to respondent but for the Pastuszek report, which respondent objected to since petitioners had not qualified Mr. Pastuszek as an expert witness. The parties agreed that the Pastuszek report would not be struck but would be admitted solely for the purpose of demonstrating that the question of valuation is focused on the property at issue and that facade easements do not have a zero value as a matter of law, a proposition to which respondent readily assented. On brief, petitioners propose that we find that, in his report, Mr. Pastuszek concluded

---

[12]Whether we exclude his testimony under Fed. R. Evid. 702(c) as not being the product of reliable principles and methods or consider it and give it no weight would seem to make little difference in this bench trial. Cf. Metavante Corp. v. Emigrant Sav. Bank, 619 F.3d 748, 760 (7th Cir. 2010) ("Although we have held that the court in a bench trial need not make reliability determinations before evidence is presented, * * * the determinations must still be made at some point.").

**[*55]** that properties with facade easements contributed to NAT suffer a diminution in value of 8% to 11%. Respondent objects, citing the limited purpose for which the Pastuszek report was admitted into evidence. We agree with respondent, and make no such finding. Moreover, given respondent's assent to the propositions that the question of valuation is focused on the property at issue and facade easements do not have a zero value as a matter of law, we see no reason to (and do not) consider the content of the Pastuszek report.

### 5. Mr. Bowman's Testimony

#### a. Introduction

The principal difference in opinion between Messrs. Hanlon and Bowman is the latter's conclusion "that the typical buyer would find the restrictions of the preservation restriction no more burdensome than the underlying South End Landmark District Standards and Criteria." Once he reached that conclusion, the precontribution comparable properties could do double duty for him as postcontribution comparables since in his opinion the effect of the preservation agreement on value was nil. His conclusion that "there was no market value associated with the facade easement preservation restriction" naturally followed.

**[*56]**            b.      <u>Comparing the Two Sets of Restrictions</u>

Although we have rejected Mr. Hanlon's testimony that the contribution of the facade easement to NAT reduced the value of the property by 12%, it does not necessarily follow that the facade easement had no value, as Mr. Bowman believes.  Petitioners argue that, "[b]y donating the facade easement, the Kaufmans ceded control of the maintenance and appearance of the protected facades to the Trust."  They also argue that, by conveying an interest in the property to NAT, Lorna Kaufman diminished the marketability of the interest in the property she retained.  They conclude:  "[L]ack of control and lack of marketability reduce the value of the Property".  Acknowledging that we might disregard Mr. Hanlon's 12% reduction in value, they argue that we should not altogether disregard his consideration of the impact of the preservation agreement on value.  Mr. Hanlon's opinion is:  "Properties encumbered by the Preservation Restriction Agreement should sell at a penalty relative to unencumbered properties in similar locations."  Petitioners summarize the factors that Mr. Hanlon considered in forming his opinion as follows:

- the additional regulation and bureaucracy that resulted from the donation of the facade easement;

- the new regulation on the rear and roof of the Property under the Rutland Square Agreement;

**[*57]** • the impact of potentially higher maintenance and insurance costs to comply with the terms of the Rutland Square Agreement;

• the risk that the owner of the Property might face legal action to compel compliance with the Rutland Square Agreement; and

• the restrictions on the yard and yard improvements under the Rutland Square Agreement.

Mr. Bowman, on the other hand, believes that the two sets of restrictions, although using "slightly different language", share "the same intent and effect." He is of the opinion that the restrictive components of the preservation agreement are "basically duplicative" of, and "not materially different" from, the South End Standards and Criteria. We think that Mr. Bowman has the better of the argument. Mr. Hanlon has failed to persuade us that the preservation agreement is materially more restrictive than the South End Standards and Criteria. We will not proceed to a component-by-component comparison of the two sets of restrictions but will address what seem to be Mr. Hanlon's key points. For the rest, we rely on and adopt Mr. Bowman's opinion.

Most notably, in his discussion of the relative disadvantages of the preservation agreement, Mr. Hanlon states: "The potential for the greatest loss of value is attributable to the National Architectural Trust's right to circumscribe the owner's rights to utilize the property for its 'highest and best use', even if legally

[*58] permissible. The loss of potential for demolition for assemblage, subdivision or alternative use could have dramatic financial implications." Inexplicably, however, he subsequently states: "[N]either the preservation agreement nor the preexisting restrictions hamper the potential for developing the property to its highest and best use as the property is currently [i.e., at the time of the preservation agreement] improved to its highest and best use as a single family home." Also, in his list of the constituent burdens encumbering properties in lightly regulated areas, he shows 0% for "loss of development potential", and he reduces from 1.5% to 0% the comparative disadvantage for the burden described as "restrictions on expansion of building". Mr. Bowman states: "As a matter of zoning, the property already exceeds the maximum allowable building envelope." Mr. Holman has failed to persuade us that the preservation agreement circumscribes the owner's rights to use the property for its highest and best use and, thus, reduces its value.

Mr. Holman believes that the preservation agreement imposes additional restrictions because, unlike the South End Standards and Criteria, "[it] applies to more than just the exterior walls, roof, and yard which are visible from the public way. The agreement's broad definition of facade includes all exterior walls, chimneys and roofs of the building and the land the building is situated upon".

[*59] Nevertheless, he reduces from 1.5% to 0% the comparative disadvantages for the burdens describe as "regulation on end walls" and "restrictions on expansion of building". He increases from 0.5% to 0.75% the comparative disadvantage for the burden described as "new regulation on rear and roof". During cross-examination, in explaining his 0.25% increase, he testified to his belief that the South End Standards and Criteria did not cover the roof of the building, but he stood corrected when pointed by respondent's counsel to the portion of those standards and criteria addressing roofs in detail. The heading of that portion illustrates its comprehensiveness: "ROOFS (including rooflines, cornices and dormers, skylights, greenhouses, arbors, penthouses, roof fences and decks, mechanical penthouses, solar panels, and devices and the like)." After reading the restrictions applicable to roofs, he insisted, nevertheless, that the standards and criteria do not cover roofing material that might have to be replaced. That is not universally true, since, with respect to slate roofs, the standards and criteria state that, for visible portions of a slate roof requiring replacement, "slate or a non-reflective material similar in color and texture to slate may be allowed." In any event, the property's roof is described in the preservation agreement as "asphalt shingle", a commonly used and widely available roofing material, and the preservation agreement requires only that the grantor agree "to maintain in good

**[*60]** order the roof * * * in the condition and appearance existing on the effective date of the this Restriction".  It is difficult for us to see that a buyer of the property would attach any penalty to what appears to be a nonexistent or, at best, insignificant difference between the South End Standards and Criteria and the preservation agreement as they apply to roof repairs.

Mr. Holman attaches a 0.5% loss in value to "new regulation of yard and yard improvements".  The preservation agreement regulates the property's facade (a defined term), including "landscape features noted as character defining features in Attachment B [to the preservation agreement]."  Attachment B states:  "A small front garden area is covered in smooth rocks encircling a young deciduous tree, and is protected by a low, decorative iron fence."  It also states:  "There does not appear to be a back yard associated with this rowhouse."  The preservation agreement obligates the owner of the property to maintain the facade in good order, as it existed on the date of the preservation agreement, and it restricts repairs, replacements, and alterations.  The South End Restrictions and Criteria include among the "most important features of buildings * * * the front yard".  They require review of all proposed changes.  Preference is given to "alterations that maintain, preserve, or restore" according to stated criteria that disapprove in advance changes such as covering the front yard with asphalt or similar materials

**[*61]** and that encourage planting.  With respect to replacement of fences, they incorporate the criteria that we quote supra p. 21 for railings, balustrades, and decorative balconies.  If anything, the South End Standards and Criteria applicable to yards and fences appear to be more restrictive than the restrictions in the preservation agreement similarly applicable.  We are unconvinced that a potential buyer of the property would consider any reduction in value to reflect the preservation restrictions' governance of changes to his front yard.

Mr. Bowman states that Mr. Hanlon provided no evidence of higher insurance or maintenance costs.  He believes that a prudent owner would maintain his residence at the same level required by either the preservation agreement or the South End Standards and Criteria.  He testified that insurance is required by most lenders.  We agree with Mr. Bowman; we are unconvinced that an owner purchasing the property subject to the preservation agreement would attach a negative value to the requirement that he maintain property damage insurance or that he maintain his property to standards established in the preservation agreement.  We are also unconvinced by Mr. Hanlon that an owner would attach a negative value to the additional regulation and bureaucracy resulting from the donation of the facade easement or to the potential for legal action for lack of compliance.  For instance, Mr. Hanlon believes that a comparative disadvantage of

**[*62]** the preservation agreement is that it subjects the owner to the inconvenience of periodic inspections. Mr. Bowman points out that the inspection is of the <u>exterior</u> of the property, which should not be much of an inconvenience, since that the owner does not have to be home. We agree. Nor are we convinced by Mr. Hanlon that the legal threat under the preservation agreement is sufficiently more severe than (or different from) the existing legal threat mentioned by Mr. Bowman for action by the City of Boston's Inspectional Services Department for unauthorized alterations or for failure to maintain the property.

Mr. Hanlon believes that the preservation agreement reduces the marketability of the property because of the added burdens it imposes. Mr. Bowman's resale study leads to the opposite conclusion, at least with respect to properties encumbered by a preservation restriction conveyed to NAT. Moreover, as Mr. Bowman reports, Mr. Kearns, past president of NAT, apparently is of the opinion that the presence or absence of an easement is only a minor factor in the buying decision.

We have little confidence in Mr. Hanlon's opinion that the preservation agreement imposed on the owner of the property restrictions significantly different from or more burdensome than the restrictions imposed by the South End Standards and Criteria. Petitioners have failed to persuade us that, on account of

[*63] the preservation agreement, lack of control and lack of marketability reduce the value of the property. To the contrary, our own comparison of the two sets of restrictions and Mr. Bowman's expert testimony have convinced us that the restrictive components of the preservation agreement are basically duplicative of, and not materially different from, the South End Standards and Criteria, and we so find.

c.     <u>Mr. Bowman's Opinions of Postcontribution Value and Value of the Facade Easement</u>

Accepting Mr. Bowman's opinion that the typical buyer would find the restrictions of the preservation agreement no more burdensome than the underlying South End Standards and Criteria, we agree with him (and find) that the postcontribution value of the property was equal to its precontribution value ($1,840,000). We further agree with him that, in the absence of any record of sales of easements comparable to the donated easement, and applying the before-and-after valuation method of section 1.170A-14(h)(3)(i), Income Tax Regs., the facade easement had no fair market value when conveyed to NAT.

E.    <u>Conclusion</u>

The facade easement had no fair market value when conveyed to NAT. Therefore, respondent's adjustments to petitioners' 2003 and 2004 tax returns

[*64] disallowing any deduction for the contribution of the facade easement to NAT are sustained.

III.    Penalty

    A.    Introduction

Section 6662 imposes an accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is due to, among other things, negligence or disregard of rules or regulations (without distinction, negligence), a substantial understatement of income tax, or a substantial valuation misstatement.  Sec. 6662(a) and (b)(1), (2), and (3).  The penalty is 20% of the portion of the underpayment of tax to which the section applies.  Sec. 6662(a).  In the case of a gross valuation misstatement, 20% is increased to 40%.  Sec. 6662(h)(1).  Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one of the grounds set out in section 6662(b).  Sec. 1.6662-2(c), Income Tax Regs.

Section 6664(c) provides a reasonable cause exception to the accuracy-related penalty.  Generally, under section 6664(c)(1), no penalty is imposed under section 6662 with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good

[*65] faith with respect to such portion. The reasonable cause exception does not apply, however, in the case of a substantial or gross valuation overstatement with respect to property for which a charitable contribution deduction was claimed under section 170 unless the claimed value of the property was based on a "qualified appraisal" by a "qualified appraiser" and the taxpayer made a good-faith investigation of the value of the contributed property. Sec. 6664(c)(2) and (3); see also sec. 1.6664-4(h), Income Tax Regs.

      B.     Valuation Misstatement Penalty

          1.     Introduction

As stated above, section 6662(a) and (b)(3) imposes a penalty of 20% of the portion of an underpayment of tax attributable to a substantial valuation misstatement. A substantial valuation misstatement exists if the value of any property reported on a tax return is "200 percent or more of the amount determined to be the correct amount of such valuation". Sec. 6662(e)(1)(A). If the valuation misstatement is 400% or more of the correct amount, a gross valuation misstatement exists and the 20% penalty increases to 40%. Sec. 6662(h)(1) and (2)(A)(i). "The value * * * claimed on a return of any property with a correct value * * * of zero is considered to be 400 percent or more of the correct amount." Sec. 1.6662-5(g), Income Tax Regs. No penalty, however, is imposed unless the

**[\*66]** portion of the underpayment attributable to the valuation misstatement exceeds $5,000. Sec. 6662(e)(2).

## 2. Positions of the Parties

Respondent argues that petitioners are liable for the 40% gross valuation misstatement penalty for 2003 because, in taking a charitable contribution deduction for 2003, petitioners claimed that the value of the facade easement was $220,800 when in truth it was zero, resulting in an underpayment of tax attributable to a gross valuation misstatement. Respondent argues likewise for 2004 on account of petitioners' carryover to that year of the unused portion of their claimed 2003 charitable contribution deduction. See sec. 1.6662-5(c)(1), Income Tax Regs.

Petitioners argue that they are liable for no valuation misstatement penalty for either 2003 or 2004 because, notwithstanding any valuation misstatement, there was reasonable cause for the resulting underpayments in tax, they acted in good faith, the claimed value of the facade was based on a qualified appraisal made by a qualified appraiser, and, in addition to obtaining that appraisal, they made a good-faith investigation of the value of the facade easement.

**[*67]**      3.      Respondent's Burden of Production

Respondent has met his burden of producing sufficient evidence that it is proper to impose the valuation misstatement penalty. See discussion supra pp. 15-17; see also sec. 7491(c). Petitioners' reported value for the facade easement exceeds the correct value by 400% or more. Petitioners' 2003 and 2004 underpayments of tax, each underpayment exceeding the $5,000 requirement of section 6662(e)(2) and each having been caused by a disallowed charitable contribution deduction claimed on account of the contribution of the facade easement to NAT, result directly from the valuation misstatement. Petitioners bear the burden of proving that the penalties are inappropriate because they had reasonable cause for the underpayments of tax and because they acted in good faith.

      4.      Reasonable Cause Exception

            a.      Qualified Appraisal by a Qualified Appraiser

As stated above, before we may consider a taxpayer's reasonable cause, good-faith defense to a valuation misstatement penalty, we must find that the reported value of the property was based on a "qualified appraisal" by a "qualified appraiser" and the taxpayer made a good-faith investigation of the value of the contributed property. Sec. 6664(c)(2) and (3). The requirement of obtaining a

[*68] qualified appraisal is also a condition that most taxpayers must satisfy before they can deduct more than $5,000 on account of a charitable contribution of property. See sec. 1.170A-13(c)(2)(A), Income Tax Regs. On appeal of our prior decision in this case, respondent argued as an alternative ground for disallowing petitioners' deductions on account of the contribution of the facade easement that they had failed to comply with "certain recordkeeping and reporting requirements that are imposed by statute, * * * § 170(f)(11), and elaborated in an accompanying regulation, * * * § 1.170A-13 [Income Tax Regs.]".[13] Kaufman v. Shulman, 687 F.3d at 28. That regulation includes as part of the definition of the term "qualified appraisal" the requirement that the appraisal be prepared by a qualified appraiser. Sec. 1.170A-13(c)(3)(i)(B), Income Tax Regs. The term "qualified appraiser" is defined in section 1.170A-13(c)(5), Income Tax Regs. The regulations provide that an individual is not a qualified appraiser if "the donor had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property". Sec. 1.170A-13(c)(5)(ii), Income Tax Regs.

---

[13]Para. (11) was added to sec. 170(f) by the American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 883(a), 118 Stat. at 1631. It is applicable to contributions made after June 3, 2004. Id. sec. 883(b), 118 Stat. at 1632. It codified the requirements in sec. 1.170A-13(c), Income Tax Regs., which Congress had directed the Secretary to promulgate. See Deficit Reduction Act of 1984, Pub. L. No. 98-369, sec. 155(a), 98 Stat. at 691.

**[\*69]** The Court of Appeals stated: "The procedural regulations requiring an appraisal report and summary are designed to provide information 'sufficient to permit [the IRS] to evaluate the [taxpayer]'s reported contribution and monitor and address concerns about overvaluation.'" Kaufman v. Shulman, 687 F.3d at 29 (quoting Consol. Investors Grp. v. Commissioner, T.C. Memo. 2009-290, 2009 WL 4840246, at \*23). Respondent had claimed "that the method of valuation used by the Kaufmans' appraiser lacked 'analytical mooring' and produced an indefensibly inflated valuation;" also, that petitioners' "contribution claim" constituted a gross valuation misstatement. Id. While acknowledging the seriousness of a gross valuation misstatement, the Court of Appeals stated that the Commissioner's "argument is largely an attempt to convert an inherently factual issue into a set of violations of the procedural requirements of section 1.170A-13 in disregard of their language and purpose." Id. The court added: "But whether the valuation was overstated, grossly or otherwise, is a factual question different from whether the formal procedural requirements were met, either strictly or under the 'substantial compliance' doctrine which may forgive minor discrepancies." Id. (emphasis added). In one respect, however, the court found that the Commissioner has raised a pertinent point; i.e., whether Mr. Hanlon was not under the regulations a qualified appraiser, which would be true if petitioners had knowledge of facts

[*70] that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property.  Id.  That question, the court stated, like the question of whether the easement was overvalued, required further fact finding by us.  Id. at 29-30.  The Court of Appeals rejected the Commissioner's alternative ground that, as a matter of law, any deduction for the contribution of the facade easement must be disallowed.

We take from the Court of Appeals' discussion that, except with respect to Mr. Hanlon's possible disqualification on account of petitioners' knowledge, petitioners satisfied the recordkeeping and reporting requirements of section 1.170A-13, Income Tax Regs.  As stated, the regulations provide that an individual is not a qualified appraiser if "the donor had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property".  Sec. 1.170A-13(c)(5)(ii), Income Tax Regs.  By way of example, the regulations add:  "e.g., the donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the fair market value of the property".  Id.  We take from the example and from the modification of the infinitive "to overstate" by the adverb "falsely" in the regulations that the expression "falsely to overstate" is intended to convey a sense of collusion and deception as to the value

**[\*71]** of the property.[14] While we will state shortly our finding that petitioners lacked reasonable cause and did not act in good faith with respect to the underpayment resulting from the disallowance of their charitable contribution deduction on account of the contribution of the facade easement to NAT, we do not believe that, as we interpret the term, Mr. Hanlon acted falsely with respect to his appraisal of the facade easement. We find that he was a qualified appraiser within the meaning of section 6664(c)(2)(A). That is not to say that he was right or that petitioners did not have reason to question his valuation; it is only to say that, with respect to the technical meaning of the term "qualified appraiser", he was qualified.

Petitioners have carried their burden of proving that the reported value of the facade easement was based on a qualified appraisal made by a qualified appraiser.[15]

---

[14]Among the meanings for the word "false" in The American Heritage Dictionary of the English Language 637 (5th ed. 2011) are "2. Deliberately untrue" and "4. Intentionally deceptive".

[15]Pursuant to sec. 1.170A-13(c)(5)(iv), Income Tax Regs., an individual is not a qualified appraiser if the individual is, among other things, an appraiser who is regularly used by the donor or donee and who does not perform most of his or her appraisals for other persons. Respondent makes no claim regarding whether Mr. Hanlon is excluded from qualifying as a qualified appraiser pursuant to sec. 1.170A-13(c)(5)(iv), Income Tax Regs., so we do not further address that issue.

**[\*72]**                    b.        Good-Faith Investigation of Value

Petitioners have not carried their burden of proving that, in addition to obtaining a qualified appraisal of the facade easement, they made a good-faith investigation that confirmed that the value of the facade easement was $220,800. The term "good faith" appears in both section 6664(c)(1) and (2)(B). Although the term has no precise definition, it means, among other things, "honesty in belief". Black's Law Dictionary 762 (9th ed. 2009); see also United States v. Goodchild, 25 F.3d 55, 59 (1st Cir. 1994) (similar definition approved in jury instruction on intent to defraud). Therefore, to satisfy the good-faith-investigation requirement imposed on them by section 6664(c)(2)(B), petitioners must demonstrate how they honestly came to believe that, beyond being simply the amount determined in the Hanlon appraisal, the value of the facade easement was $220,800. See Whitehouse Hotel Ltd. P'ship v. Commissioner, 139 T.C. 304, 358 (2012).

Petitioners argue: "After receiving the appraisal from Hanlon, the Petitioners verified that the value attributed to the easement was correct." In support of that argument, petitioners point first to Gordon Kaufman's testimony that he believed that the preservation agreement reduced the value of the property because it imposed restrictions more stringent than those imposed by the South End Standards and Criteria. He conceded, however, that he had not compared the

**[*73]** burdens imposed by the preservation agreement with those imposed by the South End Standards and Criteria. In any event, believing that the preservation agreement reduced the value of the property is not by itself verification that the preservation agreement reduced the value of the property by $220,800 or anything close to $220,800. Petitioners add: "Reading the appraisal also caused * * * Gordon Kaufman to question the impact the facade easement would have on the resale value of the Property", which prompted him to send an email to Mr. Bahar, expressing his concern that "the reduction in the resale value of the property due to the [facade] easement [is] so large as to overwhelm the tax savings that accrue from it." Mr. Bahar immediately responded to him, assuring him that properties in neighborhoods (such as petitioners') subject to local regulation and also subject to preservation agreements were not at a market disadvantage when compared to neighboring properties not so additionally burdened. Gordon Kaufman testified that he found the Bahar email only "mildly informative" because he questioned the statistical basis of Mr. Bahar's conclusions. It is somewhat odd, and not at all persuasive, that, in support of their argument that Gordon Kaufman verified that the $220,800 value for the facade reached by Mr. Hanlon was correct, petitioners bring to our attention Mr. Bahar's email, in which, whether Gordon Kaufman accepted it or not, Mr. Bahar expressed his opinion that the conveyance of the

[*74] facade easement to NAT had little or no effect on the value of the property. Petitioners have not convinced us that they made a good-faith investigation of the value of the facade easement by virtue of Gordon Kaufman's email correspondence with Mr. Bahar.

Before they filed the 2003 return petitioners provided a copy of the Hanlon appraisal to their longtime accountant, Mr. Cohen, who reviewed it and found that it was consistent in form with other real estate appraisals that he had seen. On that basis, petitioners argue that they "justifiably * * * [relied] on Mr. Cohen's positive review of the Hanlon appraisal." Mr. Cohen, however, testified that he did not express to petitioners any opinion as to whether the valuation was reasonable. Indeed, in response to a question from the Court, he agreed that it was fair to say that he had "no idea whatsoever" as to whether the value reported by petitioners on the basis of the Hanlon appraisal was accurate. We do not find that by way of Mr. Cohen petitioners made a good-faith investigation as to whether the value of the facade easement was $220,800.

Finally, petitioners point to the Primoli article and argue that their reliance, "personally and through their advisors", on the 10% to 15% range described in the article demonstrates the reasonableness of their reporting on the 2003 and 2004 returns $220,800 as the value of the facade easement. First of all, Mr. Cohen

[*75] disavowed advising petitioners as to the reasonableness of the value they claimed for the facade easement, and he did not in his testimony mention the Primoli article. Mr. Hanlon did include in his appraisal a reference to the Primoli article, and he quoted the portion of the article saying that IRS engineers have conceded the proper valuation of a facade easement should range from approximately 10% to 15% of the value of the burdened property. There is, however, no evidence that, other than perhaps having read that reference to the Primoli article, petitioners saw the Primoli article or any material mentioning it. Indeed, there is no evidence that, other than consulting Mr. Bahar, petitioners made any independent investigation of the value of the facade easement, much less an investigation confirming that its value was the value they reported on the 2003 and 2004 returns, viz, $220,800.

Because petitioners have failed to prove that they made a good-faith investigation of the value of the facade easement, there is no reason for us to consider for purposes of a valuation misstatement penalty whether with respect to the resulting underpayments in tax petitioners acted with reasonable cause and in good faith. See sec. 6664(c)(1). Nevertheless, for the sake of completeness, and because the issue is relevant for a negligence- or substantial-understatement-of-income-tax-based penalty we will do so.

**[*76]**              c.        <u>Reasonable Cause and Good Faith</u>

Under the regulations, "the most important factor" in determining whether

the taxpayer had reasonable cause for his tax treatment and whether he acted in

good faith "is the extent of the taxpayer's effort to assess the taxpayer's proper tax

liability." Sec. 1.6664-4(b)(1), Income Tax Regs. We are here concerned with the

underpayments in petitioners' tax resulting from respondent's disallowance of their

deductions on account of Lorna Kaufman's contribution of the facade easement to

NAT, which, in turn, results from petitioners' overstatement of the value of the

easement. Petitioners state that they had no background in "tax, real estate, or in

appraising real property interests." "Therefore," they continue, "they looked to an

accountant and an appraiser, who had the requisite experience to provide them the

guidance that was required." It is true that good-faith reliance on professional

advice may provide a basis for a reasonable cause defense. <u>United States v. Boyle</u>,

469 U.S. 241, 250-251 (1985); sec.1.6664-4(b)(1), Income Tax Regs.

With respect to their reliance on Mr. Cohen, their accountant, petitioners

state:

> Mr. Cohen is an accountant with over 35 years of experience with
> advanced education in accounting. Mr. Cohen researched the tax
> deduction in conjunction with the facade easement donation when
> approached by the Kaufmans. Mr. Cohen also received and reviewed
> a copy of the appraisal performed by Mr. Hanlon and believed it to be

[*77] a qualified appraisal. Mr. Cohen received a Form 8283 from the Trust which verified the donation.

While all of that may be true, the underpayment here resulted from petitioners' overstatement of the value of the facade easement. There is no evidence that either petitioner asked Mr. Cohen whether, as an accountant or as a return preparer, he had any expertise reviewing easement values. Indeed the value of the facade easement involves an issue (valuation) on which Mr. Cohen neither was qualified to advise petitioners nor advised them.

With respect to their reliance on Mr. Hanlon, petitioners state:

[They] retained Timothy Hanlon, a qualified appraiser, to appraise the property interest that they intended to donate to the Trust. Mr. Hanlon, a state licensed broker and appraiser, was qualified to perform the duties for which he was retained. The Kaufmans received an appraisal report from Mr. Hanlon that purported to comply with USPAP requirements and to be a "qualified appraisal." The Kaufmans believed that they had received a qualified appraisal from Hanlon.

While reliance on an appraiser may demonstrate reasonable cause and good faith, the regulations caution that reliance on the advice of an appraiser "does not necessarily demonstrate reasonable cause and good faith." Sec. 1.6664-4(b)(1), Income Tax Regs. Indeed, the regulations continue: "Reasonable cause and good faith ordinarily is not indicated by the mere fact that there is an appraisal of the value of the property." Id. "Other factors to consider include the methodology

[*78] and assumptions underlying the appraisal, the appraised value, the relationship between appraised value and purchase price, the circumstances under which the appraisal was obtained, and the appraiser's relationship to the taxpayer or to the activity in which the property is used." Id.

Petitioners had reason to question the conclusion in the Hanlon appraisal that the facade easement was worth $220,800. Mr. Bahar's email to Gordon Kaufman suggested that giving the facade easement to NAT did not reduce the value of the property at all. Gordon Kaufman testified that he found the information in the Bahar email only "mildly informative". He thought that the key information in the email was Mr. Bahar's discussion of the 26 properties encumbered by facade easements and tracked by NAT, none of which Mr. Bahar reported subsequently sold at a loss. Gordon Kaufman admitted that the "discussion of 26 properties * * * may or may not have been correct". He accorded it not very much weight, however, because he found it to lack statistical rigor. He admitted that (1) he did not ask Mr. Bahar for his underlying data concerning the 26 sales, and (2) he did not actually know that the study carried no weight. Certainly, as an MIT professor specializing in analytical statistics, he is qualified to have an opinion about the statistical rigor of Mr. Bahar's claims. Indeed, preparatory to his testimony voicing criticism of Mr. Bowman's

[*79] (respondent's expert's) sampling techniques, he identified himself as a "professional statistician", whose "profession is examining data and interpreting its meaning using modern statistical tools". Mr. Bahar's discussion involved a resale study, while Mr. Hanlon's appraisal was of the value of a single facade easement. Nevertheless, there was obvious discordance between Mr. Bahar's resale statistic and Mr. Hanlon's value conclusion, suggesting that one or the other was (or possibly both were) in error. Yet Gordon Kaufman, who was particularly well equipped to apply statistical rigor both to Mr. Bahar's data and to Mr. Hanlon's value conclusion, chose to do neither. That lack of initiative is certainly in contrast to the professional attention that Gordon Kaufman paid to Mr. Bowman's opinion that the facade easement had no value. In fact, Gordon Kaufman testified that he accepted the Hanlon appraisal on the basis of (1) Mr. Hanlon's credential as a professional appraiser and (2) his (Gordon Kaufman's) uncritical acceptance of the 10% to 15% range that Mr. Hanlon relied on to fix the value of the facade easement. During a discussion with the Court, he agreed that there was no basis in the Hanlon appraisal for judging the accuracy of that range and that to judge its accuracy you would have to see the sample data on which it was based. Gordon Kaufman is an expert in statistics, and he as much as admitted that he recognized the risks in Mr. Hanlon's unquestioning acceptance of the range

**[*80]** in the Primoli article. He also failed to ask for the data that might have supported Mr. Bahar's conclusion that contributions of facade easements did not reduce value. In determining whether a taxpayer has reasonably relied in good faith on advice, we take into account his education, sophistication, and business experience. See sec. 1.6664-4(c)(1), Income Tax Regs. Gordon Kaufman was a sophisticated consumer of statistical analyses, and both the Bahar email and the Hanlon appraisal gave him good reason to question Mr. Hanlon's value conclusion. We do not believe that he acted with reasonable cause and in good faith in relying without question on the Hanlon appraisal in subscribing tax returns on which he represented the value of the facade easement to be $220,800.

Petitioners have failed to prove that the underpayments in tax resulting from their overstatement of the value of the facade easement are the result of their good-faith reliance on professional advice establishing reasonable cause for the underpayments.

### 5. Conclusion

Petitioners underpaid the tax required to be shown on their 2003 and 2004 returns on account of a gross valuation misstatement. They have failed to show that, with respect to the resulting underpayments, they acted with reasonable cause

**[\*81]** and in good faith. We will, therefore, sustain respondent's imposition of accuracy-related penalties on account of that valuation misstatement.

C. Negligence Penalty

In the alternative, we sustain respondent's imposition of accuracy-related penalties due to a valuation misstatement on account of either negligence or substantial understatements of income tax. Negligence has been defined as lack of due care or failure to do what a reasonably prudent person would do under like circumstances. See, e.g., Ocmulgee Fields, Inc. v. Commissioner, 132 T.C. 105, 123 (2009), aff'd, 613 F.3d 1360 (11th Cir. 2010). Negligence also "includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Sec. 1.6662-3(b)(1), Income Tax Regs. We have in our discussion of reasonable cause and good faith described the warning signs that should have alerted Gordon Kaufman to the chance of error in the Hanlon appraisal but that he ignored. We also have in front of us the fact that when, after receiving the Hanlon appraisal and before executing the 2003 return, it came time for Lorna Kaufman to ask Washington Mutual to subordinate its mortgage to NAT's interest in the property, Gordon Kaufman joined his wife in certifying to the bank that "[t]he easement restrictions are essentially the same restrictions as those imposed by

[*82] current local ordinances that govern this property." After first testifying that he did not notice the statement when he signed the certification, he then testified that he did not read it carefully and signing the certification was a mistake, since he believed that the preservation restrictions were more stringent than those in the preservation agreement. He conceded, however, that that was his subjective judgment, since he had never compared the burdens imposed by the preservation agreement with those imposed by the South End Standards and Criteria. Lorna Kaufman testified that when she signed the certification she did not focus on the quoted statement. She also testified that she could not remember whether she had read and compared the preservation agreement to the South End Standards and Criteria. In any case, petitioners were careless, whether in not reading what they signed, in not reading carefully what they signed, or, in Gordon Kaufman's case, in reaching a subjective conclusion in willful ignorance of relevant data. We think that their carelessness is reflected in their ready acceptance of the Hanlon appraisal in the face of warning signs that it overstated the value of the facade easement, viz, the Bahar email and defects in the appraisal that should have been apparent to Gordon Kaufman. The underpayments in tax attributable to the disallowed deductions for contribution of the facade easement to NAT are

[*83] attributable to petitioners' negligence, and they have failed to show that they had reasonable cause and acted in good faith with respect to those underpayments.

Finally, petitioners argue that they escape any negligence penalty because they had a reasonable basis for claiming deductions on account of their contribution of the facade easement to NAT. Section 1.6662-3(b)(1), Income Tax Regs., provides that a return position that has a reasonable basis is not attributable to negligence. "Reasonable basis is a relatively high standard of tax reporting" and is "not satisfied by a return position that is merely arguable or that is merely a colorable claim." Sec. 1.6662-3(b)(3), Income Tax Regs. Petitioners argue: "Petitioners' facade easement donation was part of a federal tax incentive program. When Congress provides a general tax incentive through a deduction from income, those falling within the general beneficiary class are entitled to participate in the benefit." Petitioners' argument misses the point. Petitioners claimed a charitable contribution deduction of $220,800 for Lorna Kaufman's contribution of the facade easement to NAT on the basis of the Hanlon appraisal, which concluded that it was worth that amount. While we have on occasion accepted expert testimony that a facade easement reduced the value of the subject property by a particular percentage, e.g., Hilborn v. Commissioner, 85 T.C. 677, 698-699 (1985), we have cautioned that there is no general safe-harbor percentage with

[*84] respect to the value of facade easements, Nicoladis v. Commissioner, 1988 Tax Ct. Memo LEXIS 187, at *21 ("[V]aluation itself is still a question of facts and circumstances."). Petitioners can rely neither on caselaw nor on IRS engineers' statements that the proper value of facade easements "should" range between 10% and 15% of the value of the encumbered property to overcome the fact that the value of the facade easement that Lorna Kaufman contributed to NAT was nil. The mere fact that they obtained an appraisal claiming that the value of the facade easement was $220,800 does not in and of itself constitute a reasonable basis for claiming on their returns that the facade easement was worth $220,800. See sec. 1.6664-4(b)(1), Income Tax Regs. Petitioners have failed to show a reasonable basis for claiming a charitable contribution deduction of $220,800 on account of the contribution of the facade easement to NAT.

D.    Substantial Understatement of Income Tax

Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return which is attributable to any substantial understatement of income tax. An "understatement of income tax" generally means the excess of the amount of tax required to be shown on the return for the taxable year over the amount of the tax imposed that is shown on the return. Sec. 6662(d)(2)(A). The understatement is deemed

[*85] "substantial" if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000. Sec. 6662(d)(1)(A).

The amount of the understatement, however, is reduced by that portion of the understatement attributable to the tax treatment of any item (1) supported by substantial authority or (2) for which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return and there is a reasonable basis for the tax treatment of such item. Sec. 6662(d)(2)(B). Adequate disclosure has no effect where the return position lacks a reasonable basis. Sec. 1.6662-3(c)(1), Income Tax Regs. Since, as discussed in the immediately proceeding part III.C. of this report, petitioners have failed to show a reasonable basis for their tax treatment of Lorna Kaufman's contribution of the facade easement to NAT, petitioners cannot satisfy the adequate disclosure, reasonable basis standard. "The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts." Sec. 1.6662-4(d)(2), Income Tax Regs. Petitioners' argument with respect to substantial authority are substantially the same as their arguments with respect to reasonable basis, and, for the same reasons, we reject them. Petitioners have failed to show substantial authority for claiming a charitable contribution

[*86] deduction of $220,800 on account of the contribution of the facade easement to NAT.

We have sustained respondent's disallowance of charitable contribution deductions on account of the contribution of the facade easement to NAT. For both 2003 and 2004, the resulting understatement of income tax exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Respondent has met his burden of production regarding the existence of substantial understatements. Petitioners have failed to show that they had reasonable cause and acted in good faith with respect to the underpayments attributable to those understatements.

IV.   Conclusion

We sustain respondent's adjustments to petitioners' 2003 and 2004 returns disallowing any charitable contribution deductions on account of Lorna Kaufman's contribution of the facade easement to NAT. We further sustain respondent's imposition of accuracy-related penalties on account of the resulting underpayments of tax, as discussed.

Decision will be entered under

Rule 155.